Filed 12/15/15  In re A.B. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>E.S.,<br><br>        Defendant and Appellant. | A144429<br><br>(Mendocino County<br>Super. Ct. No. SCUKJVSQ1417102) |

In this juvenile dependency proceeding, E.S. (mother) of A.B. appeals from dispositional findings and order, filed on March 4, 2015, in which the juvenile court (1) terminated this juvenile dependency proceeding, and (2)  issued custody and visitation orders, awarding sole legal and physical custody of A.B. to J.B. (father), and granting mother face-to-face and telephone and electronic media visits with A.B.[1]  Mother challenges the juvenile court's finding that A.B.'s placement with father would not be detrimental to the safety, protection, or physical or emotional well-being of the child.

---

[1]      We deem mother's notice of appeal, filed on March 4, 2015, from the juvenile court's dispositional findings and orders made at the hearing on February 18, 2015, to encompass the court's written dispositional findings and order of March 4, 2015, memorializing the court's earlier findings and orders.  (Cal. Rules of Court, rule 8.104(d), (e).)

She also argues the juvenile court improperly delegated its authority when it issued its visitation order. We see no merit to mother's contentions, and accordingly, we affirm.

## FACTS[2]

### A. Background

Mother and father were married in 1999. During the marriage mother conceived two children, S.B. born in 1999 and A.B. (also referred to as the child) born in 2000. Shortly after A.B.'s birth, mother left taking both children. In 2000, mother met and had a nonmarital relationship with F.R. and she conceived J.R., who was born in 2001.

Although the record is somewhat unclear, it appears that during the ensuing years from 2001 to 2008, father moved to Louisiana and mother continued to live in California and later in Mississippi, with S.B. and A.B; the record does not indicate with whom J.R. was living during this time period. However, by 2008, mother was living in Mississippi with S.B. and A.B. Mother and father were divorced and father was granted both physical and legal custody of nine-year-old S.B., apparently leaving A.B. in the care of mother. At that time mother told father that he was not A.B.'s father and refused to allow father to have anything to do with the child. Mother had told A.B. that someone else was his father. In 2008, father remarried and since that time he, his second wife, and S.B. have lived in Louisiana.

Sometime in 2009, mother and A.B. moved back to California and apparently resumed living with F.R. and J.R. It further appears that mother's reports of domestic violence between mother and F.R. in front of the children lead to the intervention of the Mendocino County Health and Human Services Agency (the agency). From March 2010 through February 2011, the agency offered F.R. voluntary child protective services but the voluntary case was closed after a year with very little participation by F.R. During the period of agency intervention, mother was "in and out of the home" and she ultimately secured housing in a nearby town in California, leaving A.B. and J.R. in the care of F.R. Also, during the period of the agency's intervention, a guardianship

---

[2]  We set forth only those facts necessary to resolve this appeal concerning the juvenile dependency proceeding relative to A.B.

2

proceeding was filed under the Probate Code. F.R. was initially appointed temporary legal guardian of A.B., and then permanent legal guardian, by an order filed on July 27, 2011. The agency social workers presumably recommended that F.R. seek guardianship of A.B., and both parents signed consent forms; the agency social worker reported that the guardianship case "remained open" with the agency. During the pendency of the guardianship proceeding, mother told father that A.B. was his child, and father's paternity was confirmed through DNA testing. Because A.B. had a close relationship with J.R., the child's half-sibling, father felt it was best to leave A.B. in F.R.'s care while father and A.B. built a gradual relationship through telephone contact. Father and A.B. spoke on the telephone "every Sunday" for 30 minutes to one hour, and during those calls the child sometimes spoke with S.B., the child's full sibling. Additionally, father bought A.B. school clothes and supplies and "financed" the child. By late November 2014, 14-year-old A.B. and 13-year-old J.R. were still living in the home of F.R.; mother continued to live elsewhere but would visit the children at the home of F.R.

**B. Current Juvenile Dependency Proceeding**

On November 14, 2014, A.B. and J.R. ran away from the home of F.R. and went to their mother's house. Mother contacted the police based on the children's reports that while away F.R. had left the children with a babysitter who had been physically and mentally abusive toward the children. When questioned by the police, the children reported they had taken the opportunity to run away due to ongoing punitive and angry behavior by F.R. Based on the police reports, the agency detained the children and filed a Welfare and Institutions Code[3] section 300 petition, alleging, in pertinent part, that the juvenile court should find that the children came within the court's jurisdiction under subdivisions (b) (failure to protect) and (c) (serious emotional damage). (§ 300, subs. (b), (c).) The petition was based, in pertinent part, on (1) reports of F.R.'s chronic substance abuse (marijuana) and his excessively aggressive and angry behavior toward the children;

---

[3]     All further unspecified statutory references are to the Welfare and Institutions Code.

3

and (2) noncustodial mother's significant history and ongoing mental health issues and significant history and ongoing substance abuse (marijuana) issues. It was further alleged that (a) J.R. presented with significant mood swings and anger, had behavioral issues, and was afraid of living in the home of F.R., who continually berated and emotionally abused the child; and (b) A. B. was also afraid of living in the home of F.R., who repeatedly berated, and excessively yelled and cursed at the child.

### 1. Detention Hearing

At the detention hearing, the juvenile court considered the agency's detention report and letters written by A.B. and J.R., and heard testimony from A.B.'s parents, who both appeared in person, and argument by counsel. Mother testified regarding her ongoing mental health and substance abuse (marijuana) issues, her current efforts to overcome her problems, and her reasons for leaving the home of F.R. and her subsequent contacts with the children after she left. Father testified regarding the circumstances relative to his taking custody of S.B., but not A.B., at the time of the divorce from mother. Father also discussed the contents of his telephone conversations with A.B. for the last four years. Father expressed his desire to take A.B. home to live with him in Louisiana that day. The child's counsel stated that A.B. "confirms on the type of contact and support he's received from [the] father."

After argument by counsel, the juvenile court detained A.B. after finding that "there are some recent issues of concern that give rise to [mother] being a safe, full-time placement for [A.B.] . . . ." The court declared father to be the biological and presumed father of A.B. The court noted that although father was not the "child's legal custodian right now. . . . he appears to be a non-offending parent and I appreciate very much him coming and expressing his desire to have [A.B.] placed with him. . . . I think it's too much to say today that [A.B.] should up and go to Louisiana. . . . [¶] It's not based on the Court's determination that [father] wouldn't be a safe place for [A.B.] to be temporarily placed; simply that the issues are too complicated to unravel with 24 hours' notice, but it would definitely be something we would be looking at depending on how the case

4

progresses." The court ordered that father and A.B. were to have unmonitored telephone calls three times a week.

## 2. Jurisdiction Hearing

The juvenile court held a jurisdiction hearing on two days - December 19, 2014 and January 16, 2015, at which time father appeared by telephone. F.R. and A.B.'s parents submitted the matter of jurisdiction on the agency's reports. The juvenile court found true, by a preponderance of the evidence, the petition's allegations, as amended, under subdivisions (b) (failure to protect) and (c) (serious emotional damage), as against F.R. and A.B.'s mother. The agency dismissed the petition's allegation, under subdivision (b) (failure to protect), as against A.B.'s father.[4] Through his counsel, F.R. informed the court he did not seek to reunify with A.B.. The court terminated F.R.'s legal guardianship of A.B., at the request of the agency, pursuant to a stipulation of all parties in open court, and, after a finding, by clear and convincing evidence, that termination of the guardianship was in the child's best interest.

## 3. Disposition Hearing

The juvenile court held a disposition hearing on February 18, 2015, at which time the court considered the agency's report and the testimony of both A.B.'s mother, who was present in court, and father, who appeared by telephone.

The agency social worker's report described the current circumstances of mother, father, and A.B. When questioned about the possibility of the placement of A.B. with father in his home in Louisiana, mother replied that she did not prefer that placement because the child had never lived with father before the agency's intervention. But, mother felt she had a " 'good co-parenting relationship' " with father, and their communications were " 'good.' " Mother stated, father " 'for the most part is a good

---

[4]     The petition had alleged, "Alleged father of [the child], [J.B.], has left his biological child (A.B.) in the care of [F.R.] in an NRLG [Non-related Legal Guardianship] despite first-hand knowledge that [F.R.] has anger issues and is punitive and emotionally and physically abusive toward the children in his care.

parent,' " but he is " 'an enabler.' " Mother did not "totally agree" with father's parenting style, but her main concern was that he lived " 'so far away.' "

As to father's circumstances and his request for custody of A.B., the social worker reported that father did not appear to have any mental health or substance abuse issues, and father had no law enforcement contacts to the agency's knowledge   There were no outside reports and father denied having any substance abuse issues, and he voluntarily tested and was found negative for all substances.  Father, his second wife, and S.B., resided together in Louisiana.  He was employed, had six siblings with whom he stayed in contact, and his wife was a stay-at-home mother.  Father wanted to raise A.B. with S.B., the child's 16-year-old full sibling, but father did not want to " 'force' " A.B. to live with him in Louisiana.  Before the intervention of the agency, father had been "in negotiations with F.R." for a plan to have A.B. live with father at the end of the 2015 school year.  Father stated his frequent (3 times weekly) telephone visits with A.B. (then in out of home placement) had been going well and father believed he had further developed a close parent-child relationship, albeit long distance.  Father reported that A.B. had not told father about what was going on in F.R.'s home because A.B. did not believe that father could do anything to change the situation.  Father understood that A.B. required ongoing therapy to work through all that the child had been through in life.  If A.B. was permitted to live in Louisiana, father had already made plans to enroll the child in the same private school attended by S.B.  Father would facilitate frequent telephone and other contacts between A.B. and mother, as appropriate, and the child's half-sibling J.R.

As to A.B.'s circumstances, the agency social worker reported that when first detained on November 17, 2014, A.B. and J.R. had been placed together in an "MC3 placement residence."  However, there were concerns about the children remaining in placement together due to their disruptive behavior.  Thus, at the end of January 2015, the children were sent to separate local level 12 group homes.  A.B. was located in Mendocino County and J.R. was located in Redding.  As of February 2015, A.B. was enrolled in the 8th grade and doing well at school.  The child was in good overall health.

6

At the new group home, A.B. attended weekly individual and group therapeutic sessions. By February 10, 2015, the supervisor at A.B.'s new group home reported that the child "continues to maintain and do well here and displays high function in most areas. [The child] is presenting at this time to be very age appropriate in . . . social skills as well as life skills." The supervisor further noted that A.B. should be allowed "the space and ability not to feel guilty about [the child's] choices concerning who [the child] may live with in the future and the child may be getting 'guilt trips' from mom."

The agency social worker also discussed placement with A.B. The child's first preference was to live with mother and half-sibling J.R. in California. However, if that placement was not possible, the child would like to live with father. The child knew father, had a good relationship with father, and the child confirmed the frequent telephone visits with father had been going well.

The agency social worker recommended that the juvenile court terminate its jurisdiction as to A.B. and permit the child to live with father in Louisiana, with the additional recommendation that father seek continuing therapeutic services for A.B., and also family therapy to address the changes and transitions of A.B. into the home. The agency social worker opined that "with therapeutic services continuing for [A.B.], as arranged by [the] father, [J.B.], and also with Family Therapy in place to work out any issues related to [the child's] transition to the home of [the] father in Louisiana, that [the child] would do well in the home of [the] father where there is structure. In addition, [the child's] full biological sibling lives in the home and it does not appear that [the child] needs to remain in out of home placement when [the child] has a viable, loving home and family to go to where [the child] is very much wanted." If the court did not adopt the agency's recommendation, then the agency social worker thought it was likely A.B. would be moved to Louisiana anyway after the completion of an ICPC [Interstate Compact on Placement of Children] process. Alternatively, if A.B.'s parents were unable to reunify with the child, the agency social worker opined that A.B. would be placed in a permanent guardianship with a relative, which would also "most certainly be out of state."

Mother testified that since A.B.'s birth, the child had not lived for an extended period of time with father and the child had never spent any time in father's home. In 2006 or 2007, on one occasion, father came to California to visit with S.B., at which time father saw A.B. According to mother, the visit did not go well, father was more interactive with S.B. and not very interactive with A.B., and that was the last time father saw A.B. Mother confirmed that father had not learned he was A.B.'s father until the child was either 11 or 12 years old in 2011 or 2012.

Father testified that he currently lived in a three-bedroom home with two baths, and each child (S.B. and A.B.) would have their own room. The area of his residence in Louisiana was "a family-oriented place," "which is most southern." There was a local private school nearby, and A.B. would be accepted into that school. Father had also investigated and found available therapeutic services for A.B. and had spoken with the family physician who would be treating A.B. Father understood the child's need for therapy as father had done the same thing for S.B. when that child had come to Louisiana. As to the 2007 occasion when father saw A.B., father testified that mother said that if father talked to A.B. or let on that father might be the child's father, mother would not allow father to see S.B., and mother would tell S.B. that father never came. For the purpose of demonstrating that A.B. wanted to live with father, the court allowed in father's testimony that he, F.R., and A.B., had discussed A.B. moving at the end of the 2015 school year to allow the child to attend high school in Louisiana. Although A.B. wanted to move sooner, F.R. said he wanted A.B. to stay until the end of 2015. As to contact with A.B.'s mother and half-sibling J.R., father testified that if A.B. moved to Louisiana, the child's mother could call A.B. at any time and she could visit the child. Father proposed to arrange for A.B. to spend the summer with mother, and to rotate holiday visits between the parents. Father also indicated he would not restrict A.B.'s contacts with J.R.

The court accepted an offer of proof on behalf of A.B. through the child's counsel. According to counsel, the child was "on the fence." The child wanted to be with mother and J.R., with whom the child had a very close relationship. The child stated that because

8

F.R. would not let the child live with mother, the child was willing to live with father at the end of the summer.

After argument by counsel, the juvenile court granted father sole legal and physical custody of A.B. and terminated its jurisdiction as no longer necessary. The court explained that given the children's lives, there was not a solution that the agency or the court could come to that day that would prioritize every issue raised by counsel and hard decisions had to be made. The court acknowledged that the situation before it was "normal for families in our current society that are spread out and don't have resources to engage in the kind of frequent and important face-to-face contact we all would prefer. It is something that we deal with not only in this court but in family court and everywhere else." As to its reasons for its findings relative to A.B., the court explained: "It's really hard to make this call, but we don't declare children dependents when we don't have to. That is the last resort to have the state take jurisdiction over your child and to make decisions regarding your child. Anyone who has a competent parent deserves to be with their family and not have the state make decisions about them. [¶] For that reason, even though I know it is [A.B.'s] preference today to stay in California and be closer to [J.R.] [and] to attempt to reunify with [mother], I am going to adopt the agency's recommendation to award custody to [father], who, by all the evidence presented today, is a competent parent, is available to [A.B.], has an appropriate home. [S.B.] [the child's] full sibling . . . lives there. [¶] [A.B.] hasn't had much of a chance to develop a relationship with [S.B.]. And has had a closer relationship with [the child's half-sibling J.R.] But part of that situation was caused by [mother's] decisions when she was raising [A.B.] as a young child. She wasn't forthright with [father] about his parentage, and he was deprived of the opportunity to have that relationship with [A.B.] as a result. [¶] However, [father is] available now. And [A.B.] does have a relationship with [father], and I think ultimately it will benefit [the child] to live with [father]." The court also granted mother visits with the child. The court directed that mother's visits were to be a minimum of once a week by phone or electronic media such as Skype, Twitter, or Facebook. The court asked father to monitor the communications between A.B. and

9

mother from time to time until father felt it safe and appropriate for unmonitored contact. The court noted that mother was then participating in services and she was making "a lot of progress," but the court wanted "to start off slow." The court also directed that A.B. was to have visits with J.R., the child's half-sibling, by telephone or electronic media, as permitted by J.R.'s program, for a minimum of once every two weeks, to be monitored by A.B.'s father until father felt the communications did not need to be monitored. The court further directed "face-to-face [visits] between [A.B.] and [mother] and A.B. and [J.R.] as frequently as could be arranged between the custodial parents or the person holding the custody rights for [J.R.] and/or the other parent." "[U]ntil" A.B.'s mother and father went to family court "with more definite information about [the] ability to visit on a certain schedule," the in-person visitation order was the best that the juvenile court could do at that time. If either mother or father believed the orders needed to be changed, the juvenile court advised the parents that their remedy was to seek relief by either mutual agreement or by securing a change order in family court.

The juvenile court issued written findings and custody and visitation orders on March 4, 2015 relative to A.B., consistent with its findings and orders made at the dispositional hearing. The court's written findings and orders, provide, in pertinent part: "Visits between the child and [the] mother would not be detrimental to the well-being of the child," "[v]isitation between the child and the mother shall be as indicated on the JV-200 [form];" "Mother [E.S.]: Face-to-face visits shall occur as frequently as possible at such dates, times and locations arranged between the parents. Additionally, [the child] may visit [the] mother weekly by telephone or electronic media such as Skype, Twitter, FaceBook, etc. Father . . . may monitor or semi-supervise the visits to ensure that the visits are beneficial for [the child.]" [5] Mother's timely appeal ensued.

---

[5] At the dispositional hearing, the juvenile court issued separate findings and orders declaring J.R. a dependent of the court and granting the child's parents (mother and F.R.) reunification services. J.R. is not a subject of this appeal.

## DISCUSSION

### I.      Applicable Law

At issue here is section 361.2, which permits the juvenile court to grant legal and physical custody of the child to a noncustodial parent after lawful removal of the child from a custodial parent or legal guardian.  (§ 361.2, subs. (a), (b), (c)[6]; see *In re V.F.* (2007) 157 Cal.App.4th 962, 969 (*V.F.*); *R.S. v. Superior Court* (2007) 154 Cal.App.4th 1262, 1270.)  "If a noncustodial parent requests custody of a child, the trial court must determine whether placement with that parent would be detrimental to the child.

---

[6]      Section 361.2, reads, in pertinent part: "(a) When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. . . . [¶] (b) If the court places the child with [the non-custodial] parent it may do any of the following: [¶] (1) Order that the parent become legal and physical custodian of the child.  The court may also provide reasonable visitation by the noncustodial parent.  The court shall then terminate its jurisdiction over the child.  The custody order shall continue unless modified by a subsequent order of the superior court.  The order of the juvenile court shall be filed in any domestic relation proceeding between the parents. [¶] (2) Order that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months.  In determining whether to take the action described in this paragraph, the court shall consider any concerns that have been raised by the child's current caregiver regarding the parent.  After the social worker conducts the home visit and files his or her report with the court, the court may then take the action described in paragraph (1), (3), or this paragraph.  However, nothing in this paragraph shall be interpreted to imply that the court is required to take the action described in this paragraph as a prerequisite to the court taking the action described in either paragraph (1) or (3). [¶] (3) Order that the parent assume custody subject to the supervision of the juvenile court.  In that case the court may order that reunification services be provided to the parent or guardian from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child. [¶] (c) The court shall make a finding either in writing or on the record of the basis for its determination under subdivisions (a) and (b)."

11

(§ 361.2, sub. (a).) . . . In the absence of a finding of detriment, the court must place the child with the noncustodial parent. (§ 361.2, sub. (a).)" (*V.F., supra,* at p. 970.) "The court 'may' at that point retain jurisdiction and order reunification services for the parent [or legal guardian] from whom the child was removed, or it 'may' order the former noncustodial parent to become the legal and physical custodian of the child and terminate jurisdiction over the child. (§ 361.2, sub. (b)(1) & (3).)" (*In re Ryan K.* (2012) 207 Cal.App.4th 591, 594, fn. 4.) " '[W]hen the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court.' " (*In re Chantal S.* (1996) 13 Cal.4th 196, 203, quoting from *In re Roger S.* (1992) 4 Cal.App.4th 25, 30.)

## II. Juvenile Court's Orders of Custody and Termination of Juvenile Dependency Proceeding

Relying on isolated and contradictory portions of the record, mother seeks reversal of the orders of custody and termination of the juvenile dependency proceeding on the ground that "there was substantial evidence" of detriment to A.B. if placed with father in Louisiana.[7] Mother contends her goal on appeal "is not to rebalance [the] facts, but rather to mount a legal challenge as to whether the juvenile court properly applied section 361.2." According to mother, the juvenile court "erred as a matter of law in not finding detriment" to A.B. by placing the child in Louisiana, due to father's failure to effectively intervene in the child's life before the agency's intervention in 2014, father's lack of

---

[7] Mother also argues that the juvenile court improperly removed A.B. from her care as she was not a custodial parent at the time the juvenile dependency proceeding was initiated by the agency. However, she presents no cogent argument supporting reversal on this ground. In all events, at the time the juvenile dependency proceeding was initiated, A.B. was in the lawful custody of F.R., the child's legal guardian, and the juvenile court removed the child from the physical custody F.R.; the juvenile court did not remove A.B. from the physical custody of mother. Once A.B. was lawfully removed from the physical custody of F.R., the juvenile court followed the required procedures under section 361.2 for determining the placement of the child. (See *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1820.)

12

relationship with the child, the child's problems and wishes, and the child's separation and loss of a close relationship with a half-sibling. However, none of the factors cited by mother, either standing alone or together, are determinative of a finding of detriment. (See *In re C.M.* (2014) 232 Cal.App.4th 1394, 1402-1403 [child's wishes, sibling bonds, alleged lack of established relationship with noncustodial parent, child would be mostly in care of stepmother, found not sufficient to support finding of detriment]; *In re Abram L.* (2013) 219 Cal.App.4th 452, 460-461, 464 [wishes of 14- and 15-year-old siblings and alleged lack of relationship between children and noncustodial parent found not sufficient to support finding of detriment]; *id*. at p. 463 [finding of detriment was not supported by allegations of noncustodial parent's misconduct, which were dismissed by the juvenile court, and in the absence of evidence demonstrating misconduct at any time after the dependency proceeding began]; *In re John M*. (2006) 141 Cal.App.4th 1564, 1567, 1569, 1570 [almost 14-year-old child's wishes, need for therapeutic services, relationship with 10-month half-sibling and members of extended family, lack of a relationship with noncustodial father, the paucity of information about father, and mother's reunification plans found not sufficient to support a finding of detriment].) Thus, despite her contention to the contrary, mother is, in effect, asking us to "reweigh the evidence of detriment, which is inconsistent with our standard of review." (*In re Liam L.* (2015) 240 Cal.App.4th 1068, 1088, citing to *In re Stephanie M*. (1994) 7 Cal.4th 295, 319 [" ' "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court" ' "]; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947 ["[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts"].) We see nothing in the cases cited by mother that supports reversal in this case.

We also reject mother's contention that the juvenile court erred in terminating its jurisdiction after finding there was no need for continuing supervision. According to mother, the juvenile court should have considered securing additional evidence concerning the suitability of father's home - either through an ICPC evaluation or by alternative means, such as ordering father to comply with services, requiring periodic

reports to an in-state social services department, and requiring that the child be made available to the in-state social worker. However, an ICPC evaluation was not a prerequisite to the juvenile court's placement order directing father to assume legal and physical custody of A.B. and terminating its jurisdiction. (§ 361.2, sub. (b); see *In re C.B.* (2010) 188 Cal.App.4th 1024, 1036 [compliance with ICPC is never required for placement of a child with an out-of-state parent "regardless of whether the father was an offending or a nonoffending parent"]; Cal. Rules of Court, rule 5.616(b)(1)(A) ["[a] court's directing or making an award of custody to a parent of the child or placing a child with his or her parent is not a placement requiring compliance with this rule [implementing the purposes and provisions of the ICPC]".) Similarly, the juvenile court was not mandated to condition its termination of jurisdiction on father complying with certain family maintenance services as argued by mother.

We conclude by noting that the agency social worker recommended that A.B. be placed with father and that the court terminate its jurisdiction without further court supervision. "The juvenile court could reasonably agree with that assessment." (*In re Liam L., supra*, 240 Cal.App.4th at p. 1089.) We see no deficiencies in the evidence that are so "sufficiently egregious" as to require us to remand for further proceedings. (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413.)

## III.    Juvenile Court's Visitation Order

Mother also challenges that portion of the juvenile court's visitation order, which reads, in pertinent part: "Face-to-face visits shall occur as frequently as possible at such dates, times and locations arranged between the parents." According to mother, the juvenile court's order leaves father in control of whether face-to-face visits will occur at all. "If father does not agree, mother will not get a visit." She therefore contends that the order constitutes an impermissible delegation of the juvenile court's authority, and the matter must be reversed and/or remanded to ensure the juvenile court assumes its judicial responsibility. We see no merit to mother's argument.

We initially note that the juvenile court explained its reasons for its "face-to-face" visitation order to which mother lodged no objection on the grounds she now asserts on

14

appeal.  In all events, we see no merit to mother's contention that we should reverse and remand to allow the juvenile court to issue a more definitive visitation order.  Unlike the situations in the cases cited by mother, the order here cannot be read as granting father complete discretion over whether mother has any visits with A.B.  The order "contemplates that all persons subject thereto would remain under the control of the family court and that any party who wished to contest the . . . continued propriety of the order based on changed circumstances . . . would be able to raise that issue in the family court." (*In re Chantal S., supra*, 13 Cal.4th at p. 214.)  If there are problems with arranging face-to-face visits with the child, mother is free to seek appropriate relief in the family court.

## DISPOSITION

The dispositional findings and order, filed on March 4, 2015, are affirmed.


_____
Jenkins, J.


We concur:


_____
McGuiness, P. J.


_____
Pollak, J.